CANTERRA PETROLEUM, INC., Plaintiff and Appellee,

v.

WESTERN DRILLING & MINING SUPPLY, Defendant, Third Party Plaintiff and Appellee,

v.

NORTHSTAR EQUIPMENT CORPORATION, Third Party Defendant, Fourth Party Plaintiff and Appellant,

v.

YAMIN OIL SUPPLY, Fourth Party Defendant.

Civ. No. 870114.

Supreme Court of North Dakota.

Dec. 29, 1987.

Fleck, Mather, Strutz & Mayer, P.C., Bismarck, for Canterra Petroleum, Inc., and by stipulation for Western Drilling & Mining Supply; argued by Curtis L. Wike, Bismarck.

Bennett Aisenberg, Denver, Colo., and Wheeler, Wolf, Peterson, Schmitz, McDonald & Johnson, Bismarck, for Western Drilling & Mining Supply; appearance by stipulation through Canterra Petroleum, argued by Curtis L. Wike, Bismarck.

Gordon, Hurwitz, Butowsky, Weitzen, Shalov & Wein, New York City, and Zuger & Bucklin, Bismarck, for North Star Equipment Corp.; argued by Robert V. Bolinske, Bismarck.

Steven M. Yamin, Yamin Oil Supply, Houston, Tex. No appearance.

ERICKSTAD, Chief Justice.

NorthStar Equipment Corporation ["NorthStar"] appeals from a district court summary judgment awarding Western Drilling & Mining Supply ["Western"] $228,245.72 on its third-party claim against NorthStar. We reverse and remand for trial.

This multi-party litigation arises out of various transactions involving a certain quantity of oilfield pipe. The pipe was originally owned by Mitchell Energy Corporation ["Mitchell"]. In late 1981, Mitchell entrusted the pipe to Port Pipe Terminal, Inc. ["Port Pipe"] for storage.

Through paper transactions, two high-ranking employees of Port Pipe succeeded in fraudulently transferring apparent ownership of the pipe to Pharoah, Inc. ["Pharoah"], a "dummy" corporation which they had created to facilitate the fraudulent sale of merchandise stored at Port Pipe's facilities. On March 3, 1982, Pharoah sold the pipe owned by Mitchell to Nickel Supply Company, Inc. ["Nickel"]. On that same date, Nickel sold the pipe to Yamin Oil Supply ["Yamin"]. Five days later Yamin sold the pipe to NorthStar. On March 23, 1982, NorthStar sold it to Western, which a few days later sold it to Canterra Petroleum, Inc. ["Canterra"].

All of these intervening transactions, culminating in the sale to Canterra, were paper transactions only. The pipe never left Port Pipe's storage facility in Houston, Texas, until Canterra had it delivered to Getter Trucking in Dickinson sometime after its purchase in March 1982. The pipe remained stored at Getter Trucking until December 1983, when Canterra relinquished the pipe to Mitchell upon being informed by law enforcement agencies that the pipe was owned by Mitchell.

Canterra sued Western for breach of warranty of title seeking damages of $201,014.39, the price Canterra had paid for the pipe, plus interest. Western commenced a third-party action against NorthStar for breach of warranty of title, and NorthStar commenced a fourth-party action against Yamin.

Canterra moved for and received summary judgment against Western. Western then moved for summary judgment on its third-party claim against NorthStar. The court granted summary judgment to Western, awarding $228,245.72 in damages and interest. NorthStar has appealed from the judgment.[1]

1. The trial court determined that there was no just reason for delay in entry of judgment pur-

NorthStar contends that it did not breach the warranty of title, and that it presented sufficient evidence to demonstrate that material issues of fact remain to be resolved on the issue of title. NorthStar also contends that the trial court applied an incorrect measure of damages, and that material issues of fact need to be resolved by the factfinder to arrive at the proper amount of damages, if any.

The issues presented in this case must be resolved within the context of a motion for summary judgment. Summary judgment is a procedural device available for the prompt and expeditious disposition of a controversy without a trial if there is no dispute as to either the material facts or the inferences to be drawn from undisputed facts, or if only a question of law is involved. *Mid–America Steel, Inc. v. Bjone,* 414 N.W.2d 591, 592 (N.D.1987). The evidence must be viewed in the light most favorable to the party against whom summary judgment is sought, and summary judgment is not appropriate if reasonable differences of opinion exist as to the inferences to be drawn from undisputed facts. *Belgarde v. Rosenau,* 388 N.W.2d 129, 130 (N.D.1986).

## I. LIABILITY

NorthStar contends that this case falls within the entrustment provision of the Uniform Commercial Code, codified at Section 41–02–48(2), N.D.C.C. [U.C.C. § 2–403]:

> "2. Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business."

In essence, this statute contains three elements: (1) an entrustment of goods, (2) to a merchant who deals in goods of the kind, (3) followed by a sale to a buyer in the ordinary course of business. *Toyomenka, Inc. v. Mount Hope Finishing Co.,* 432 F.2d 722, 727 (4th Cir.1970); *Executive Fi-*

*nancial Services, Inc. v. Pagel,* 238 Kan. 809, 715 P.2d 381, 387 (1986); *American Clipper Corp. v. Howerton,* 311 N.C. 151, 316 S.E.2d 186, 194 (1984); Duesenberg & King, 3A Bender's Uniform Commercial Code Service: Sales & Bulk Transfers, § 10.06[3] (1987). If all three elements are present, the rights of the entruster are transferred to the buyer in ordinary course of business. NorthStar argues that Mitchell entrusted the pipe to Port Pipe, a merchant who dealt in pipe, and that through Pharoah the pipe was sold to Nickel, a buyer in the ordinary course of business.

The trial court held that, based upon the affidavits presented, there was no factual dispute as to Port Pipe's status and that, as a matter of law, Port Pipe was merely a storage facility and not a merchant which dealt in pipe. "Merchant" is defined in Section 41–02–04(3), N.D.C.C. [U.C.C. § 2–104]:

> "3. 'Merchant' means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill."

Although this definition provides several ways by which a party may acquire "merchant" status, the entrustment statute applies only to a "merchant who deals in goods" of the kind entrusted. *See* Section 41–02–48(2), N.D.C.C. [U.C.C. § 2–403].

The determination whether a party to a transaction is a "merchant" under the Uniform Commercial Code is a question of fact. *See, e.g., Greater Southern Distributing Co. v. Usry,* 124 Ga.App. 525, 184 S.E.2d 486, 487 (1971); *Bauer v. Curran,* 360 N.W.2d 88, 90 (Iowa 1984); *Ferragamo v. Massachusetts Bay Transportation Authority,* 395 Mass. 581, 481 N.E.2d 477, 480

suant to Rule 54(b), N.D.R.Civ.P. The court subsequently entered summary judgment in favor of NorthStar on its fourth-party claim

against Yamin, awarding damages and interest in the amount of $195,561.63.

(1985); *Agrex, Inc. v. Schrant,* 221 Neb. 604, 379 N.W.2d 751, 754 (1986); *Arigo v. Abbott & Cobb, Inc.,* 86 A.D.2d 958, 448 N.Y.S.2d 311, 312 (1982); *Fred J. Moore, Inc. v. Schinmann,* 40 Wash.App. 705, 700 P.2d 754, 757 (1985). As noted by the Supreme Judicial Court of Massachusetts:

> "Moreover, that inquiry 'is of necessity highly dependent on the factual setting of the transaction in question. Consequently, whether a person is a merchant is to be determined according to the circumstances of each case.' 1 R.A. Anderson, *supra* at § 2–104:25." *Ferragamo v. Massachusetts Bay Transportation Authority, supra,* 481 N.E.2d at 480 (quoting 1 Anderson, Uniform Commercial Code § 2–104:25 (3d ed. 1981)).

Western contends that there is no dispute as to the facts regarding this issue, and that the court correctly determined as a matter of law that Port Pipe is a storage facility and not a merchant dealing in pipe. Western relies primarily upon the affidavits of Bradley Beers, an assistant district attorney in Texas who prosecuted the two employees responsible for diverting materials stored at Port Pipe's facilities, and Janet Chisholm, former president of Port Pipe. These affidavits state in conclusory terms that Port Pipe was not a "merchant" dealing in oilfield pipe. Chisholm's affidavit, however, goes on to state that "Port Pipe ... did sell small quantities of pipe from time to time, to clear odd lots, or to sell that pipe remaining after a substantial portion of a lot was sold."

The entrustment statute requires that goods be entrusted to a "merchant who deals in goods of that kind." Section 41–02–48(2), N.D.C.C. [U.C.C. § 2–403]. The requirement that the party "deals in goods" has been construed to mean one who is engaged regularly in selling goods of the kind. *Toyomenko, Inc. v. Mount Hope Finishing Co., supra,* 432 F.2d at 727; *Tumber v. Automation Design & Mfg. Corp.,* 130 N.J.Super. 5, 324 A.2d 602, 606 (1974); 3 Anderson, Uniform Commercial Code § 2–403:31 (3d ed. 1983).

The conclusory statements contained in the affidavits of Beers and Chisholm that Port Pipe was not a merchant which dealt in oilfield pipe are not dispositive of the issue. We have previously expressed our dissatisfaction with affidavits containing conclusory statements that are not supported by specific facts. *See Federal Land Bank of St. Paul v. Asbridge,* 414 N.W.2d 596, 598 (N.D.1987); *Federal Land Bank of St. Paul v. Anderson,* 401 N.W.2d 709, 712 (N.D.1987).

The relevant factual inquiry is whether Port Pipe was regularly engaged in selling pipe. The party opposing summary judgment, in this case NorthStar, is entitled to all favorable inferences which can reasonably be drawn from the evidence. *Federal Land Bank of St. Paul v. Asbridge, supra,* 414 N.W.2d at 598. Viewing Chisholm's affidavit in the light most favorable to NorthStar, we conclude that it does raise an inference that Port Pipe regularly sold pipe. Chisholm admits that Port Pipe did sell pipe "from time to time." It will be for the factfinder, after presentation of further evidence regarding the frequency and quantity of Port Pipe's sales of pipe, to determine whether Port Pipe regularly engaged in the sale of pipe and therefore was a merchant which dealt in pipe.

■ Western contends that Port Pipe's non-merchant status has been determined by the Court of Appeals of Texas in *Kirby Exploration Co. v. Mitchell Energy Corp.,* 701 S.W.2d 922 (Tex.Ct.App.1985). *Kirby, supra,* involved another instance where the same two Port Pipe employees had sold pipe owned by Mitchell through their "dummy" corporation, Pharoah. After a series of interim transactions the pipe was eventually sold to Kirby. Upon being informed of Mitchell's ownership interest in the pipe Kirby refused to return it, and Mitchell sued Kirby for conversion. The Court of Appeals of Texas affirmed a summary judgment in favor of Mitchell, stating that "there is no evidence in support of Kirby's bare allegation that there was an entrustment by either Oilworld or Mitchell to a merchant dealing in oilfield pipe." *Kirby, supra,* 701 S.W.2d at 926.

Western apparently contends that the Texas court's resolution of this issue is res

judicata and binding upon the parties to this case. It is well settled, however, that a party is not generally bound by a judgment in a previous action to which he was not a party, and the judgment and evidence introduced in the previous action have no evidentiary value against him. *Bohn v. Johnson,* 371 N.W.2d 781, 785 (N.D.1985); *Sierra Life Insurance Co. v. Wigen,* 286 N.W.2d 296, 299 (N.D.1979); *Sturdevant v. SAE Warehouse, Inc.,* 270 N.W.2d 794, 798–799 (N.D.1978). As we noted in *Bohn v. Johnson, supra:*

> " '... Beyond the small circle which contains parties and privies, a judgment in personam is evidence only of the fact that such a judgment has been rendered. It cannot be used to prove any other fact which it establishes as between the parties to the judgment.' " *Bohn v. Johnson, supra,* 371 N.W.2d at 786 (quoting *Tierney v. Phoenix Ins. Co.,* 4 N.D. 565, 62 N.W. 642, 643 (1895)).

Neither NorthStar nor this court is bound by the determination of Port Pipe's status in the Texas litigation.

Western also contends that, even if a fact question remains unresolved regarding Port Pipe's merchant status, summary judgment is nevertheless appropriate. Western asserts that the entrustment doctrine of Section 41–02–48(2), N.D.C.C., applies only when the merchant who has been entrusted with the goods sells them in the ordinary course of business. Western contends that the doctrine does not apply where the goods are fraudulently transferred to a dummy corporation by employees of the entrustee and subsequently sold through the dummy corporation to a buyer in the ordinary course of business.

This is a troublesome issue, with neither party directing our attention to a case precisely on point. Both sides have, however, cited cases involving somewhat similar circumstances.

Western relies primarily upon *Textile Supplies, Inc. v. Garrett,* 687 F.2d 123 (5th Cir.1982), and *Olin Corp. v. Cargo Carriers, Inc.,* 673 S.W.2d 211 (Tex.Ct.App.1984). In *Textile Supplies, supra,* Couch, a carpet salesman working for Textile Supplies, diverted a shipment of carpet, owned by Textile Supplies and destined for another purchaser, to his own corporation, Cartersville. Couch, through Cartersville, then sold the carpet to Garrett. When Textile Supplies sued Garrett for the value of the carpet, Garrett contended that he had acquired title through the entrustment doctrine of Section 2–403, U.C.C. The court correctly held that there had been no entrustment and the doctrine was therefore inapplicable. The entrustment doctrine requires that the goods be entrusted by the owner to a merchant. Textile Supplies never entrusted the goods to anyone, including Couch, its salesman. Rather, Couch somehow diverted this shipment from its intended destination to his own corporation, and thereafter sold them to Garrett. Because there was never an entrustment of the goods by the owner, the statute was clearly inapplicable.

In *Olin, supra,* Olin had entrusted fertilizer for storage at the warehouse of Cargo Carriers. The superintendent of Cargo Carriers' warehouse, Jerry Dollar, entered into a scheme with Charles Flowers to sell some of Olin's fertilizer. Flowers would represent himself as the owner of the fertilizer, and Dollar would use his authority to release the fertilizer to the buyer. Several loads of fertilizer were sold in this manner to Ragsdale. When Olin sued Dollar, Flowers, Cargo Carriers, and Ragsdale for the misappropriated fertilizer, Ragsdale sought the protection of Section 2–403, U.C.C. The court held that the statute was inapplicable to Ragsdale because (1) his seller, Flowers, had no title,[2] (2) Olin never entrusted the fertilizer to Flowers, and (3) Flowers was not a merchant who dealt in

**2.** We are not certain why Flowers's lack of title was important. The entrustment statute *presupposes* that the seller to the buyer in ordinary course of business has no title to convey. If the seller had title, the buyer would not need the protection afforded by the statute, which allows the title of the entruster to pass to the buyer. Thus, in the classic entrustment example, when an owner entrusts goods to a merchant for repair and the merchant sells them to a buyer in the ordinary course of business, the merchant has no title but the title of the entruster passes to the buyer by operation of the statute.

the sale of fertilizer. *Olin, supra,* 673 S.W.2d at 216. These circumstances are materially distinguishable from the instant case. Flowers, Ragsdale's seller, was not an employee of Cargo Carriers but an outside party. Of even more significance is the court's finding that Flowers was not a merchant. Under those circumstances, the entrustment doctrine of Section 2–403, U.C.C., was inapplicable.

This case is readily distinguishable from *Textile Supplies* and *Olin.* The court in *Textile Supplies* based its holding upon the lack of an entrustment of the goods by the owner. In this case, it is undisputed that Mitchell entrusted the pipe to Port Pipe for storage. In *Olin,* the court's holding was based upon the intervention of Flowers, who was not a merchant and was a party unrelated to either the entruster or the entrustee. In this case, however, there is no intervention by an unrelated party. The intervention was by two high-ranking employees of Port Pipe, the entrustee, who allegedly sold the pipe through their dummy corporation, Pharoah, to a buyer in the ordinary course of business.

We believe this case to be more closely analogous to *Standard Leasing Corp. v. Missouri Rock Co.,* 693 S.W.2d 232 (Mo.Ct. App.1985). In that case, Standard Leasing had entrusted two trucks to Herco for repair. Herco was a corporation in the business of leasing, selling, and repairing construction equipment. Herco's president, Robert Herring, transferred the trucks to Superior, a sham corporation created by Herring to fraudulently dispose of assets held by Herco. The trucks were sold by Superior to Dean, who in turn sold them to Missouri Rock. Standard Leasing sued Missouri Rock for replevin and conversion, and Missouri Rock claimed title under the entrustment doctrine. The court, in sustaining a jury verdict for Missouri Rock, held that the fraudulent transfer of the trucks from the entrustee, Herco, to a sham corporation controlled by Herco's president did not render the entrustment doctrine inapplicable. The court focused upon the underlying policies of Section 2–403:

> "Our conclusion is consistent with the policy of § 400.2–403(2) to increase the marketability of goods. *See,* Padgett, *Uniform Commercial Code Section 2–403(2): The Authority of a Bailee to Convey Title,* 21 U.Fla.L.Rev. 241, at 251 (1968–69). Section 2–403(2) places a greater burden on bailors than previous uniform commercial statutory enactments to exercise discretion in entrusting their goods to bailees. *Id.* In our case, both plaintiffs and defendants are innocent victims of fraudulent schemers. But under UCC 2–403(2) Standard took the risk that its bailee might set up a sham corporation to aid it in its unlawful transfer of Standard's property. Where one of two innocent parties must suffer a loss occasioned by a third person, the person who enabled the acts of the wrongdoer must suffer the loss." *Standard Leasing, supra,* 693 S.W.2d at 237.

This rationale has also been expressed in 3 Anderson, Uniform Commercial Code § 2–403:4 (3d ed. 1983) (quoting *Sacks v. State,* 172 Ind.App. 185, 360 N.E.2d 21 (1977)):

> " 'Section 2–403 was intended to determine the priorities between two innocent parties: (1) the original owner who parts with his goods through fraudulent conduct of another and (2) an innocent third party who gives value for the goods to the perpetrator of the fraud without knowledge of the fraud. By favoring the innocent third party, the Uniform Commercial Code endeavors to promote the flow of commerce by placing the burden of ascertaining and preventing fraudulent transactions on the one in the best position to prevent them, the original seller.' "

We believe this policy also supports application of the entrustment doctrine to a situation where employees of the entrustee transfer the entrusted goods to their sham corporation, which in turn sells the goods to a buyer in the ordinary course of business. As between the two innocent parties in this case [Mitchell, which entrusted the pipe to Port Pipe, and Nickel, which bought the pipe in the ordinary course of business from Pharoah], the policy of the Code places the risk of the entrustee's employees fraudulently diverting and selling the goods upon the entruster, Mitchell, which

had the opportunity to select its entrustee. Applying the doctrine to this case, Nickel would acquire the title of the entruster, Mitchell, and title would have passed on to the subsequent purchasers of the pipe.[3]

We conclude that the trial court erred in holding that, as a matter of law, Port Pipe was not a "merchant" under Section 41–02–48(2), N.D.C.C., and that the entrustment doctrine was therefore inapplicable. Material issues of fact remain which require resolution upon trial.

## II. DAMAGES

Although we conclude that the summary judgment must be reversed and the case remanded for trial, in the interest of judicial economy we will address the other issue raised by NorthStar which has a potential for arising again upon trial on the merits.[4]

NorthStar contends that the trial court applied the wrong measure of damages in determining the recovery allowable to Western for breach of the warranty of title. Section 41–02–93(2), N.D.C.C. [U.C.C. § 2–714], sets forth the measure of the buyer's damage for breach of the warranty of title:

"2. The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount."

The trial court held that there were no "special circumstances" present in this case and therefore determined damages based upon the general rule of the statute—the difference at the time and place of acceptance between the value of the goods accepted and their value if they had been as warranted. The court determined this difference to be $176,421.56, the amount Western had paid NorthStar for the goods.

NorthStar contends on appeal that "special circumstances" exist which take this case out of the general rule. NorthStar asserts that our holding in *Schneidt v. Absey Motors, Inc.*, 248 N.W.2d 792 (N.D. 1976), dictates that damages be assessed as the difference between the value of the pipe accepted and its value if it had been as warranted at the time Canterra lost possession and use of the pipe. NorthStar apparently concedes that the pipe accepted, without title, had no value. Thus, under NorthStar's suggested measure of damages, Western would be able to recover the market value of the pipe on the date it was removed from Canterra's possession.

*Schneidt, supra,* involved the journey of a 1970 Lincoln Continental, from Florida to Montana, through the hands of several purchasers. The vehicle was stolen from its original owner, Hertz, and came into the hands of Ronald Fischer. Fischer sold the car to David Ramage, who sold the car to Absey Motors, which sold it to Carl Schneidt, who sold it to Dallas Bentley. Hertz located the vehicle in Bentley's possession and sued Bentley in Montana, claiming title. Bentley returned the car to

**3.** This scenario presupposes, of course, that Port Pipe was a merchant. As previously noted, that determination will be for the finder of fact at trial. If it is found that Port Pipe was not a merchant, Section 41–02–48(2), N.D.C.C. [U.C.C. § 2–403] is inapplicable, and Mitchell retained title to the pipe.

Although not addressed by the parties, the "shelter" principle governs subsequent transactions after entrusted goods have been sold and title transferred to a buyer in ordinary course of business. The rule is explained in 3 Anderson, Uniform Commercial Code § 2–403:59 (3d ed. 1983):

"The sale by the entrustee makes a definitive transfer of the entruster's title. Hence, not only the immediate buyer from the entrustee but all successive transferees of the goods hold the title of the entruster. That is, once a

buyer acquires title by virtue of UCC § 2–403, subsequent purchasers from him benefit by his title without regard to whether they themselves would qualify as buyers in ordinary course of business."

**4.** We are aware that, if the facts as determined at trial vary substantially from the "facts" presented to the trial court on the motion for summary judgment, the applicable law regarding damages could change. Although we have sometimes declined to address the issue of damages when there remain unresolved factual disputes on the issue of liability, *see, e.g., Stamper Black Hills Gold Jewelry v. Souther,* 414 N.W.2d 601 (N.D.1987), we believe that in this case the interests of judicial economy require consideration of the damages issue.

Schneidt, who allowed Bentley to use the Lincoln as a trade-in on another car. The Lincoln was eventually returned to Hertz by order of a Montana court.

Schneidt then sued Absey Motors for breach of warranty of title, and Absey Motors filed a third-party complaint against Ramage. Schneidt received summary judgment against Absey Motors on the issue of liability, and Absey Motors in turn was granted summary judgment on liability against Ramage. The issue of damages was tried to the court. The trial court, applying the general rule of Section 41–02–93(2), N.D.C.C. [U.C.C. § 2–714], awarded damages based upon the purchase price Schneidt had paid to Absey Motors.

We reversed, concluding that there were special circumstances which justified application of a different measure of damages. The general import of our holding in *Schneidt* is that special circumstances exist where there has been a breach of warranty of title but the purchaser has enjoyed the use and possession of the goods for a substantial period of time. In such cases, the appropriate measure of damages is the value of the goods at the time the purchaser loses possession and use. *Schneidt, supra,* 248 N.W.2d at 798. Cases from other jurisdictions are in accord. *See, e.g., U–J Chevrolet Co., Inc. v. Marcus,* 460 So.2d 1341, 1343 (Ala.Ct.Civ.App.1984); *City Car Sales, Inc. v. McAlpin,* 380 So.2d 865, 868 (Ala.Ct.Civ.App.1979), *cert. denied,* 380 So.2d 869 (Ala.1980); *De Weber v. Bob Rice Ford, Inc.,* 99 Idaho 847, 590 P.2d 103, 105 (1979); *Ricklefs v. Clemens,* 216 Kan. 128, 531 P.2d 94, 99 (1975); *Metalcraft, Inc. v. Pratt,* 65 Md.App. 281, 500 A.2d 329, 336–337 (1985); *see also* Annot., *Measure of Damages in Action for Breach of Warranty of Title to Personal Property under UCC § 2–714,* 94 A.L.R.3d 583 (1979).

The basis of our holding in *Schneidt, supra,* was that Schneidt had possession and use of the vehicle for a period of time without knowledge of the defective title. "Special circumstances" exist in that situation because it would be unjust to allow the purchaser unfettered use and possession of the goods for a substantial period of time and then allow recovery of the full purchase price paid for the goods.

In this case there clearly was no "use" of the goods by any of the purchasers. The undisputed evidence shows that, as the apparent ownership of the pipe passed from Nickel to Yamin to NorthStar to Western to Canterra, the pipe remained in Port Pipe's storage facility in Houston. Canterra had the pipe transported to Dickinson sometime after its purchase in 1982, but it remained in storage at the facilities of Getter Trucking until returned to Mitchell in December, 1983. Western, the relevant purchaser in this case, had paper ownership of the pipe for only a few days before reselling it to Canterra.

Thus, there was no actual "use" of the pipe which would constitute "special circumstances" under Section 41–02–93(2), N.D.C.C. We therefore conclude that the general rule of Section 41–02–93(2) was applicable, and the appropriate measure of damages for a breach of the warranty of title, if any, in this case will be the difference at the time of sale between the value of the goods accepted and the value they would have had if they had been as warranted.[5]

For the foregoing reasons, the summary judgment is reversed and the case is remanded for trial on the merits.

GIERKE, VANDE WALLE, LEVINE and MESCHKE, JJ., concur.

---

5. Although the parties apparently did not dispute that the value of the pipe if it had been as warranted when accepted was equal to the purchase price paid by Canterra, we note that the purchase price may be strong evidence of the value of the goods at the time of acceptance but it is not conclusive. *See, e.g., Winchester v. McCulloch Brothers Garage, Inc.,* 388 So.2d 927, 928 (Ala.1980); *Auto–Teria, Inc. v. Ahern,* 170 Ind.App. 84, 352 N.E.2d 774, 783 (1976); *Ricklefs v. Clemens, supra,* 531 P.2d at 100; *Lyon v. Shelter Resources Corp.,* 40 N.C.App. 557, 253 S.E.2d 277, 281 (1979); *Carlson v. Rysavy,* 262 N.W.2d 27, 31 (S.D.1978); *Mulvaney v. Tri State Truck & Auto Body, Inc.,* 70 Wis.2d 760, 235 N.W.2d 460, 465 (1975).